# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# LAFAYETTE-OPELOUSAS DIVISION

| | | |
|---|---|---|
| **NORRIS MENARD** | * | **CIVIL ACTION NO. 06-2257** |
| **VERSUS** | * | **JUDGE DOHERTY** |
| **COMMISSIONER OF SOCIAL SECURITY** | * | **MAGISTRATE JUDGE HILL** |

## REPORT AND RECOMMENDATION

This social security appeal was referred to me for review, Report and Recommendation pursuant to this Court's Standing Order of July 8, 1993. Norris Menard, born December 7, 1955, filed an application for a period of disability and disability insurance payments on March 25, 2002, alleging disability as of July 8, 2001, due to degenerative disc disease of the lumbar spine, peripheral neuropathy, and depression. After the application was denied at the administrative level, claimant appealed to this Court under Docket No. 04-0477. On June 7, 2005, Judge Rebecca F. Doherty issued a Judgment reversing and remanding this case for further proceedings, specifically for a consultative examination to fully assess claimant's impairments and their effect on claimant's residual functional capacity, as well as to consider whether the conclusion would be altered in light of the evidence contained in Dr. Cobb's report, which was written after the ALJ's decision. [Tr. 25; Docket No.

04-0477, rec. doc. 10]. By Order dated September 21, 2005, the Appeals Council remanded this case to an ALJ for further proceedings consistent with the Court's order. (Tr. 105).

While claimant's appeal was pending in this Court, claimant filed a second application for disability insurance benefits, as well as one for supplemental security income payments, on March 26, 2004, alleging an onset date of December 20, 2003. After these applications were denied, Administrative Law Judge ("ALJ") Michael Wahlder held a hearing on May 31, 2005, at which time he requested that claimant be sent for post-hearing consultative examinations, consisting of a psychological evaluation with Dr. Henry LaGarde and a physical examination with Dr. Raymond Taylor.[1]

By order dated September 21, 2005, the Appeals Council remanded claimant's first application, and order that his subsequent applications be consolidated with the first one. (Tr. 105-08). After a remand hearing, ALJ Lawrence Ragona issued an unfavorable decision on September 22, 2006. (Tr. 10-19). Subsequently, claimant appealed the ruling to this Court.

---

[1] The transcript of the hearing before ALJ Wahlder is not in the record.

FINDINGS AND CONCLUSIONS

After a review of the entire administrative record and the briefs filed by the parties, and pursuant to 42 U.S.C. § 405(g), I find that there is not substantial evidence in the record to support the Commissioner's finding that the claimant was not disabled and that this case should be reversed.

In fulfillment of F.R.Civ.P. 52, I find that this case should be reversed, based on the following:[2]

**(1) Records from Dr. John E. Cobb dated October 8, 2003 to August 8, 2005**.  On October 8, 2003, claimant complained of back pain with a burning sensation into the groin, pain radiating into the buttocks and thigh just about the knee, and some numbness in his feet. (Tr. 191).  He also had recent onset of diabetes, heartburn, and slightly elevated blood pressure.  Additionally, he had headaches, paralysis or weakness of limb, loss of sensation, nervousness, depression, difficulty with thinking, and difficulty with problem solving. (Tr. 192).

On examination, claimant's range of motion was somewhat diminished. Straight leg raise testing was positive.  Neurologically, he was normal.

---

[2] Although all of the medical records were reviewed by the undersigned, only those subsequent to the remand are summarized herein.

A lumbar MRI dated July 31, 2002, showed disc degeneration at L4-5 and L5-S1. The L5-S1 space was significantly narrowed, and appeared to be very likely fixed. Claimant had a very slight signal change at L3-4.

Dr. Cobb's impression was symptomatic anterior column failure, primarily at L4-5. He recommended an anterior interbody fusion at L4-5. (Tr. 193).

On September 29, 2004, Dr. Cobb reviewed some MRIs from Charity in New Orleans, which showed that L5-S1 was severely collapsed, almost fixed disc space. (Tr. 233). L4-5 demonstrated some modic changes, indicating degeneration and some collapse. L3-4 showed very mild, subtle changes.

Claimant continued to complain fairly bitterly about neck pain and leg numbness down to the foot and ankle. Dr. Cobb's assessment was symptomatic disc disease with primarily anterior column failure, and probably some degree of neuropathic pain in his lower extremities. He again recommended surgery, but claimant had no funding for treatment.

On August 8, 2005, Dr. Cobb wrote that claimant was unable to work pending surgical treatment. (Tr. 302).

**(2) Consultative Examination by Dr. Raymond F. Taylor dated June 28, 2005**.[3]  Claimant complained of low back pain since a lifting injury in 1992.  (Tr. 263).  He also reported daily headaches, depression, burning pain in the feet and ankles, and diabetes.  His diabetes was pretty well-controlled, and he was taking no medications for it.

Claimant's medications included Paxil, Hydrocodone/APAP, Ultram, and Carisoprodol.  (Tr. 264).  He had recently separated from his wife, and lived alone.

On examination, claimant was 73 inches tall, and weighed 215 pounds.  Range of motion of the neck was normal.  (Tr. 265).  Back range of motion was limited.  Straight leg raising was negative.  Claimant had no spasm or tenderness over the paracervical or paravertebral muscles, but had tenderness over the right sacroiliac joint and left sacrosciatic notch.  (Tr. 267-68).

Range of motion of the extremities was normal.  (Tr. 268).  Claimant had no loss of muscle strength or atrophy.  His grip strength was excellent.  Manual dexterity and grasping ability were normal.

Claimant had no swelling, instability, or deformities of the joints.  His gait was antalgic.  Station was normal.  He had difficulty walking on his toes.

---

[3]This exam was conducted prior to the Appeals Council's remand order dated September 21, 2005.  (Tr. 105).

Neurologically, claimant as oriented to time, place, and person. His cranial nerves and motor nerve function were normal. He had decreased sensation in a stocking-like distribution distal to the mid-calf bilaterally. Deep tendon reflexes were normal.

Psychologically, claimant was neatly dressed and groomed. His behavior was appropriate. Thought content, affect, and mood were all normal. Concentrating ability and memory were normal.

Dr. Taylor's diagnoses were mechanical low back pain, probably secondary to spondylosis, type II diabetes, peripheral neuropathy secondary to diabetes, and a history of depression and headaches. Claimant had decreased sensation over both of his lower calves and feet, which Dr. Taylor opined was more than likely a peripheral neuropathy due to poor glycemic control.

Based on claimant's physical findings, Dr. Taylor believed that claimant's work-related activities needed to be limited. He stated that claimant should do no lifting or carrying of objects over 40 pounds, or perform frequent lifting or carrying of objects over 25 pounds. He opined that claimant could stand and walk for 4 hours out of an 8-hour day. He reported that claimant should not perform work-related activities requiring frequent bending, stooping, squatting, or climbing.

In the Medical Source Statement of Ability to do Work-related Activities (Physical), Dr. Taylor opined that claimant could lift/carry 40 pounds occasionally and 25 pounds frequently. (Tr. 268). He stated that claimant could stand/walk at least 4 hours in an 8-hour workday. He said that claimant's ability to sit and push/pull were not affected by his impairment.

Dr. Taylor stated that claimant could occasionally climb, kneel, crouch, crawl, and stoop, and frequently balance. (Tr. 270). He noted that claimant had no manipulative, visual/communicative, or environmental limitations. (Tr. 271-72).

**(3) Consultative Psychological Examination by Henry J. Lagarde, Ph.D., dated July 12, 2005**. Claimant was able to perform all self-help activities independently, but with much pain. (Tr. 273). He spent much time listening to the radio. He rarely performed household chores. He had a good relationship with his children. He could go into town alone and shop alone when necessary. He was able to manage money. He had a driver's license.

On examination, claimant thought logically and coherently. (Tr. 275). He maintained adequate attention and concentration. His memory was fair. He was oriented in all spheres. His affect was appropriate. His behavior indicated he was having some difficulty adjusting to pain.

Claimant's affect was also depressed, and he sometimes teared when discussing some life problems. His capacity for judgment was intact. His insight was intact.

Claimant complained of being very sad and depressed because of feeling hopeless about how to cope with his physical problems, as well as his wife leaving him and taking the children a few days before the evaluation. However, he claimed to have also been depressed prior to his family leaving him.[4] He reported having trouble enjoying routine activities, falling asleep at night, eating, some moderate concentration problems, and fatigue. (Tr. 276). Additionally, he reported some anxiety, which had increased since his family had separated from him.

On testing, claimant obtained a full-scale IQ score of 96, verbal score of 94, and performance score of 98. These scores reflected intellectual capability in an average range.

Dr. Lagarde's diagnosis was major depressive disorder, single episode. (Tr. 277). He determined that claimant was able to understand, remember, and carry out simple, detailed instructions. He noted that claimant would be able to maintain attention at a simple task for two-hour blocks of time. He stated that claimant would

---

[4]This is supported by the records from University Medical Center, Dr. Cobb, and Iberia Comprehensive Community Health Center from 2003 and 2004 all of which indicated that claimant had depression, for which he was taking Zoloft and Paxil. (Tr. 180, 187, 191, 198-200, 205, 240, 242, 251-54).

have some trouble maintaining persistence and consistency during a full-time work week because of depression and anxiety. For the same reason, claimant would have trouble coping with routine stress at a full-time job.

Dr. Lagarde stated that claimant would be able to relate effectively with supervisors and co-workers in a disciplinary sense, but would have trouble maintaining emotional equilibrium at that time. He opined that claimant was able to manage his own funds.

Dr. Lagarde noted that claimant's request for medical review was for physical limitations, not mental. Therefore, he could not complete the form attached to the evaluation. However, he stated that he would be glad to complete an ALJ mental form if desired.

**(4) Records from Iberia Comprehensive Community Health Center dated April 6, 2005 to June 6, 2006**. On April 6, 2005, claimant complained of back and foot pain. (Tr. 301). His medications included Ultram, Lortab, Paxil, and Soma. (Tr. 300-01). He was also treated in 2005 for depression and diabetes. (Tr. 282-83, 288-89, 295, 298-99, 318-19).

On March 13, 2006, claimant complained of increased back and leg pain with activity, bilateral foot pain, and severe headaches. (Tr. 281). The assessment was chronic pain. He was prescribed Paxil, Ultram, Lortab, Naprosyn, and Lyrica. (Tr.

9

281, 309).

On May 24, 2006, claimant was followed up for chronic back pain and headaches. (Tr. 312). The impression was chronic pain of the back and feet, and depression. His Lortab was increased.

On May 31, 2006, claimant's diabetes was controlled by diet. (Tr. 311). He was prescribed medication for heartburn and hypertension.

**(5) MRI dated June 6, 2006**. An MRI of the lumbar spine showed a very slight scoliotic deformity of the lumbar spine, generalized lower lumbar degenerative disease, disproportionately prominent and advanced at the L5-S1 level with associated asymmetrically prominent right-sided foraminal narrowing. (Tr. 306-07).

**(6) Claimant's Administrative Hearing Testimony**. At the hearing on June 8, 2006, claimant was 50 years old. (Tr. 331). He was 6 feet 1 inch tall, and weighed about 210 pounds, which was up about seven pounds from his normal weight. He stated that he was recently divorced, and was living by himself. (Tr. 331-32).

Claimant had completed high school. (Tr. 332). He had attended college for two years in accounting. He had past work experience as a steam cleaner in the oilfield, and a manual laborer at Fruit of the Loom for 20 years. (Tr. 333). He had also worked as an enumerator for the census bureau and a stocker at Wal-Mart. (Tr. 334, 343).

Claimant testified that he had not worked since he got hurt in 2001. (Tr. 334). He complained of daily severe headaches, a major tear in his back, an out-of-line vertebra, and depression. (Tr. 335, 344). He also reported bilateral leg pain just above the knee in the thigh area and neuropathy in both feet. (Tr. 335). He stated that he was being treated at Iberia Comprehensive for pain and depression. (Tr. 336).

Claimant reported that he had crying spells, and that he had to lie down to ease the nerve pains radiating from his head and back. He stated that he was taking pain medications, which helped very little.

Regarding activities, claimant testified that he rested in his recliner a lot and watched television. (Tr. 337). He did his laundry and grocery shopped. He drove a standard truck two or three days a week. He read very little. (Tr. 339).

As to restrictions, claimant testified that he could lift about 10 pounds. (Tr. 338). He stated that he could walk for about a block before his back became inflamed with pain and swelling. He reported that he used ice packs, which alleviated the swelling very little. (Tr. 339). He said that he could sit for about 15 or 20 minutes without a brace and an ice pack. (Tr. 340).

Additionally, claimant stated that he could stand for three to five minutes before his legs started going numb. (Tr. 345). He reported that he had pain with bending, and needed a support with squatting. He testified that he had side effects

from his medications, including drowsiness, fatigue, and dry mouth.  (Tr. 346).

**(7) Administrative Hearing Testimony of Beverly Prestonback, Vocational Expert ("VE")**.  Ms. Prestonback classified claimant's past work as a stocker as heavy with an SVP of 4; a census enumerator as light with an SVP of 3, and a shipping/warehouse clerk as medium to heavy with an SVP of 5.  (Tr. 347-49).  The ALJ posed a hypothetical in which he asked the VE to assume a claimant of the same age, education, and work experience; who could lift and carry 40 pounds occasionally and 25 pounds frequently; could stand and walk about 4 hours in an 8-hour day; could sit for 6 hours; and, because of emotional problems, could not do complex work and needed a work environment with limited interaction with the general public.  (Tr. 349-50).  In response, Ms. Prestonback opined that claimant could not do his past work.  (Tr. 350).  However, he could work as a stock clerk and order filler, office helper, and bookkeeper.  (Tr. 351).

The ALJ modified the hypothetical to add daily headaches that were disabling to the point that claimant could not work.  (Tr. 351).  In response, the VE testified that there would be no jobs available.  (Tr. 352).  When the ALJ again modified the hypothetical to add emotional problems which resulted in crying spells or positions where he could not work three or four times a month, Ms. Prestonback opined that there would not be any jobs for such claimant.

**(8) The ALJ's Findings**. Claimant argues that the ALJ erred in assessing his residual functional capacity, resulting in an erroneous determination that he was not disabled. Because I find that the ALJ failed to consider whether claimant could maintain employment, and also failed to consider the side effects of claimant's medications, I recommend that this case be **REVERSED**, and that claimant be awarded benefits as of March 26, 2004.[5]

At the outset, claimant argues that the consultation with Dr. Taylor was in connection with the second application, and not the Court's remand order. [rec. doc. 8, pp. 4-5; rec. doc. 10, pp. 1-2]. Indeed, the record reflects that Dr. Taylor's examination was dated June 28, 2005, which was three months before the Appeals Council issued the remand order on September 21, 2005. (Tr. 105, 263). Thus, there is no way possible way that Dr. Taylor could have considered the order on remand issued by Judge Doherty, which specifically called for a consultative examination to fully assess claimant's impairments and their effect on claimant's residual functional capacity, as well as to consider whether the conclusion would be altered in light of the evidence contained in Dr. Cobb's report which written after the ALJ's decision. (Tr. 25).

---

[5]This is the date of claimant's application for supplemental security income payments. Claimant remained insured for disability insurance benefits through September, 2005.

In any event, the evidence subsequent to the first ALJ's decision indicates that claimant does not have the ability to maintain employment. Claimant's treating physician, Dr. Cobb, diagnosed claimant on October 8, 2003, with symptomatic anterior column failure, for which he recommended an anterior interbody fusion at L4-5. (Tr. 192-93). On September 29, 2004, Dr. Cobb opined that claimant's lumbar spine at L5-S1 was severely collapsed, and assessed him with symptomatic disc disease with primarily anterior column failure and some degree of neuropathic pain in his lower extremities. (Tr. 233). He again recommended surgery, but claimant had no funding for treatment. On August 8, 2005, Dr. Cobb wrote that claimant was unable to work pending surgical treatment. (Tr. 302).

In the decision, the ALJ discounted Dr. Cobb's opinion because he saw claimant only three times, and did not specify exactly what limitations claimant had that prevented him from working. (Tr. 16). It is well established that the opinion of a treating physician who is familiar with the claimant's impairments, treatments and responses, should be accorded great weight in determining disability. *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000); *Leggett v. Chater*, 67 F.3d 558, 566 (5th Cir. 1995); *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994), *cert. denied*, 514 U.S. 1120, 115 S.Ct. 1984, 131 L.Ed.2d 871 (1995). A treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is

"well supported by medically acceptable clinical and laboratory diagnostic techniques and *is not inconsistent with ... other substantial evidence.*" (emphasis added). *Newton,* 209 F.3d at 455 (citing 20 C.F.R. § 404.1527(d)(2)). Good cause for abandoning the treating physician rule includes disregarding statements by the treating physician that are brief and conclusory, not supported by medically accepted clinical laboratory diagnostic techniques, or otherwise unsupported by evidence. *Leggett*, 67 F.3d at 566; *Greenspan*, 38 F.3d at 237.

In this case, Dr. Cobb based his opinions on claimant's physical findings, as well as two MRIs. Based on claimant's physical examination, as well as a lumbar MRI dated July 31, 2002, Dr. Cobb diagnosed claimant with was symptomatic anterior column failure, for which recommended an anterior interbody fusion at L4-5. (Tr. 192-93). On September 29, 2004, Dr. Cobb reviewed some MRIs from Charity in New Orleans, which showed that L5-S1 was severely collapsed, almost fixed disc space. (Tr. 233). His assessment was symptomatic disc disease with primarily anterior column failure, and probably some degree of neuropathic pain in his lower extremities. He again recommended surgery, but claimant had no funding for treatment. He further found that claimant was unable to return to work. Despite these findings, which were supported by medically accepted clinical laboratory diagnostic techniques, the ALJ found that Dr. Cobb's opinion was not consistent with the record.

In *Newton*, the Fifth Circuit, citing 20 C.F.R. § 404.1527(d)(2), held that an ALJ must consider the following factors before declining to give any weight to the opinions of a treating doctor: length of treatment, frequency of examination, nature and extent of relationship, support provided by other evidence, consistency of opinion with record, and specialization. 209 F.3d at 456; *see also Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001). The Fifth Circuit noted that this regulation is construed in Social Security Ruling ("SSR") 96-2p, which states:

> [A] finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. *Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927.* In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted even if it does not meet the test for controlling weight.

SSR 96-2p, 61 F.R. 34490, 34491 (July 2, 1996) (emphasis added).

Additionally, the Fifth Circuit relied on SSR 96-5p which provides, with respect to "Residual Functional Capacity Assessments and Medical Source Statements," that "Adjudicators must weigh medical source statements under the rules set out in 20 C.F.R. 404.1527···, providing appropriate explanations for accepting or rejecting such opinions." SSR 96-5p, 61 F.R. 34471, 34474 (July 2, 1996). In this

case, the ALJ failed to perform this analysis, which was error.

Additionally, the record reflects that claimant was taking several medications, including Paxil, Ultram, Lortab, Naprosyn, and Lyrica. (Tr. 281, 309, 312, 317). Lortab is a narcotic medication designed for the relief of moderate-to-severe pain. Under the regulations, the Commissioner is required to consider the "type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate [] pain or other symptoms." *Crowley v. Apfel*, 197 F.3d 194, 199 (5th Cir. 1999) (citing 20 C.F.R. § 404.1529(c)(3)(iv)). The ALJ did not consider the side effects of claimant's medications on his ability to work, and his failure to do so was error.

Finally, claimant asserts that he was unable to maintain employment. [rec. doc. 8, p. 5]. Dr. Lagarde found that claimant would have some trouble maintaining persistence and consistency during a full-time work week because of depression and anxiety. (Tr. 277). For the same reason, he found that claimant would have trouble coping with routine stress at a full-time job. He further determined that claimant would be able to relate effectively with supervisors and co-workers in a disciplinary sense, but would have trouble maintaining emotional equilibrium at that time.

A finding that a claimant is able to engage in substantial gainful activity requires more than a simple determination that the claimant can find employment and

that he can physically perform certain jobs; it also requires a determination that the claimant can hold whatever job he finds for a significant period of time." *Watson v. Barnhart*, 288 F.3d 212, 217 (5th Cir. 2002) (citing *Singletary v. Bowen*, 798 F.2d 818, 822 (5th Cir. 1986)). Further, the ability to work only a few hours a day or to work only on an unpredictable or intermittent basis does not constitute the ability to engage in "substantial gainful activity." *Tucker v. Schweiker*, 650 F.2d 62, 64 (5th Cir. 1982); *Cornett v. Califano*, 590 F.2d 91, 94 (4th Cir. 1978); *Prestigiacomo v. Celebrezze*, 234 F.Supp. 999 (E.D. La. 1964).

Here, the ALJ erred in failing to determine whether claimant was capable not only of obtaining employment, but also maintaining it. *Watson*, 288 F.3d at 218. Claimant's treating physician, Dr. Cobb, specifically determined that claimant was unable to work due to his symptomatic back condition. (Tr. 302). Additionally, the record reflects that claimant would have difficulty working because of the side effects from his medications. (Tr. 346). Further, Dr. Lagarde found that claimant would have some trouble maintaining a full-time job because of his depression and anxiety. (Tr. 277). Based on this evidence, the decision of the ALJ should not stand.

Accordingly, it is my recommendation that the Commissioner's decision be **REVERSED**, and the claimant be awarded benefits. The undersigned recommends that March 26, 2004, which is also the date of the filing of the application for

supplemental security income payments, be used as the onset date for the commencement of benefits.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have ten (10) business days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN TEN (10) DAYS FOLLOWING THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT, EXCEPT UPON GROUNDS OF PLAIN ERROR.** *DOUGLASS V. UNITED*

*SERVICES AUTOMOBILE ASSOCIATION,* **79 F.3D 1415 (5TH CIR. 1996).**

Signed October 26, 2007, at Lafayette, Louisiana.

*C. Michael Hill*

C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE